**Robert S. AMENDOLA, Plaintiff,**

v.

**William HENDERSON, Postmaster General, United States Postal Service, Defendant.**

**No. 97–CV–3452(JS).**

United States District Court,
E.D. New York.

Sept. 6, 2001.

Jesse S. Drucker, Bracken & Margolin, LLP, Islandia, NY, for Plaintiff.

Gail A. Matthews, Assistant United States Attorney, Eastern District of New York, Central Islip, NY, for Defendant.

*MEMORANDUM AND ORDER*

SEYBERT, District Judge.

Robert S. Amendola ("plaintiff") commenced this action against his employer William Henderson, Postmaster General of United States Postal Service (the "Postal Service" or "defendant") under the Rehabilitation Act of 1973 (the "Rehabilitation Act" or the "Act"), *as amended,* 29 U.S.C. §§ 701 *et seq.,* alleging unlawful employment discrimination and retaliation. Specifically, plaintiff claims he requested, and was denied, a "reasonable accommodation" for the period commencing on April 9, 1993 through his post-operative recovery from

"foot surgery." Second Amended Verified Complaint ("Am. Compl.") ¶¶ 17–18. In particular, plaintiff claims the Postal Service denied his request to elevate his foot while performing his job duties. Am. Compl. ¶ 17. Additionally, plaintiff claims the Postal Service further violated the Act by retaliating against him for pursuing a prior complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Am. Compl. ¶ 34.

Pending before the Court is defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. In support of the motion, Defendant argues: (1) plaintiff has failed to establish a prima facie claim for disability discrimination under the Rehabilitation Act; (2) plaintiff cannot establish the essential elements of a retaliation claim; (3) even if plaintiff could establish a prima facie claim of either discrimination or retaliation, plaintiff cannot refute legitimate, nonpretextual reasons for the challenged action; (4) plaintiff's claims of discrimination prior to March 23, 1993, are untimely and should be dismissed; and finally (5) plaintiff cannot pursue either claim because he successfully pursued the Postal Workers' Union Grievance Procedures and has been duly compensated for the damages he claims in this action.[1]

For the reasons stated below, defendant's motion for summary judgment is granted.

## PROCEDURAL HISTORY

On June 13, 1997, plaintiff filed the present action naming as defendants, Marvin T. Runyon,[2] Postmaster General of the United States ("Postmaster General") and two postal service employees, William Balkin and Ernest Hupfer. Thereafter, plaintiff filed an Amended Verified Complaint on March 26, 1998. Subsequently, on July 7, 1998, plaintiff filed a Second Amended Verified Complaint correcting procedural defects and naming the Postmaster General as the sole defendant.

## FACTUAL BACKGROUND

The following statement of facts is primarily provided by the parties' respective Local Civil Rule 56.1 Statements and exhibits attached thereto.

### I Plaintiff's History with the Postal Service

Plaintiff began working at the United States Postal Service in 1987. Defendant's Local Civil Rule 56.1 Statement ("Def. 56.1") ¶ 2; Matthews Decl., Ex. 1 (Deposition of Robert S. Amendola ("Pl. Dep.")) at 54–55. Plaintiff filled out an employment application on January 30, 1987 and began working as a part-time flexible distribution clerk on February 28, 1987. *Id.* According to the "Medical Examination and Assessment Form" attached to plaintiff's employment application, there are certain functional requirements for his position as a distribution clerk, including *inter alia:* repeated bending; climbing (legs only and with the use of both arms and legs); and the ability for rapid mental and muscular coordination simultaneously. Def. 56.1 ¶ 3; Matthews Decl., Ex. 2B (Application for Employment); Pl. Dep. at 102–05. This form was filled out by plaintiff and a Postal Service Doctor who conducted a medical examination and assessment of plaintiff in connection with plaintiff's employment ap-

---

1. Despite numerous extensions of time, plaintiff failed to submit a memorandum of law in opposition to defendant's motion for summary judgment.

2. William Henderson was subsequently substituted as the Postmaster General. *See* Declaration of Assistant United States Attorney Gail A. Matthews, dated Apr. 4, 2000, ("Matthews Decl."), at p. 1 fn. 1 (citing Fed. R.Civ.P. 25(d)).

plication. Def. 56.1, ¶ 4; Pl. Dep. at 101–02. During the examination, plaintiff denied having any restrictions of his functional abilities. *Id.* However, plaintiff did mention that he had corrective surgery on his toes in 1972 while serving in the United States Air Force in Japan. Matthews Decl., Ex. 2B (Medical Examination and Assessment Form); Def. 56.1, ¶ 5; Pl. Dep. at 101. Plaintiff further indicated that the 1972 surgery "corrected" the problem. *Id.* At the commencement of plaintiff's employment, his toes did not interfere with any of the required functional abilities necessary to perform his job as a distribution clerk. Def. 56.1, ¶ 6; Pl. Dep. at 101.

Relatively soon after plaintiff began working for the defendant, he suffered a hip injury. It is disputed whether this injury was the result of an arthritic hip condition, Def. 56.1 ¶ 7, or just a work-related hip injury causing plaintiff discomfort while he worked. Pl. 56.1 ¶ 7; *see also* Pl. Dep. at 107–08. On September 18, 1987, plaintiff was seen by Postal Service physician Yvonnecris S. Veal, M.D., for the hip problem, at which time he requested to be placed on "light duty" status. Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8; Pl. Dep. at 111–13. Upon concluding a physical examination of plaintiff, Dr. Veal placed plaintiff on restricted duty, as opposed to full duty, which fell within the definition of "light duty" [3] as opposed to "limited duty" [4] under the pertinent Postal Service Regulations. Def. 56.1 ¶¶ 9–10; Pl. 56.1 ¶¶ 9–10; *see also* Veal Decl. ¶ 10–11. As a result, plaintiff was limited to sedentary duties, with very little walking or standing, no lifting over 10 pounds, and plaintiff was expected to use a cane for ambulation. Def. 56.1 ¶ 10. Plaintiff subsequently became a full-time employee in 1988. Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.

Following the hip injury, plaintiff was examined periodically by Postal Service physicians between September 1987 and June 1991. Def. 56.1 ¶ 12. On June 17, 1991, plaintiff was examined by Dr. Veal who observed that plaintiff was in "very good condition" and walking without a limp. Def. 56.1 ¶ 13. As a result, Dr. Veal altered plaintiff's "Fit For Light Duty" status to allow lifting up to 30 pounds, and limited standing until the Postal Service received a "Fit For Duty" release from plaintiff's primary medical doctor. Def. 56.1 ¶ 14; Veal Decl. ¶ 15. . On June 24, 1991, defendant received such a letter from Dr. Martin L. Racanelli, plaintiff's treating physician. Def. 56.1 ¶ 15; *see also* Mat-

---

**3.** The Postal Service Regulations define "light duty" as follows:

> The term light duty refers to an injury/illness that is *not job-related* and is provided to an employee who has physical limitations identified by a qualified physician which allows the employee to work at performance levels less than his/her normal work requirement. *Light duty must be requested in writing by the employee accompanied by medical certification* indicating the physical limitations and projected duration of the impairment. Light duty positions are negotiable at the local levels . . .

Declaration of Yvonnecris S. Veal, M.D., dated Apr. 4, 2000, ("Veal Decl."), ¶ 11 (quoting Ex. B. attached thereto) (emphasis original). *See also* Def. 56.1 ¶ 79.

**4.** The Postal Service Regulations define "limited duty" as follows:

> Limited Duty is that duty provided to an employee who has physical limitations, identified by a qualified/treating physician, resulting from an *on-the-job injury.* Limited Duty is provided when the physical limitations allow the individual to return to work, performing less than his/her normal work requirement. Every reasonable effort will be made to identify and make limited duty available to those employees who are physically able to perform limited duty.

Veal Decl. ¶ 11 (quoting Ex. B attached thereto) (emphasis original). *See also* Def. 56.1 ¶ 79.

thews Decl., Ex. 2E (Letter by Dr. Raca-nelli, dated June 24, 1991). On July 8, 1991, Dr. Veal allowed plaintiff to return to full duty and notified Defendant that plaintiff was "Fit For Duty." Def. 56.1, ¶ 16; Matthews Decl., Ex. 2E at p. 1. Plaintiff remained on "Fit For Duty" status until he suffered a job-related injury to his wrist and knee while working on May 29, 1995. Def. 56.1 ¶ 17. Following the wrist and knee injury, plaintiff was placed on "Limited Duty" status. *Id.* Plaintiff never visited the Postal Service medical department for complaints regarding his toes and does not recall whether he received any treatment for his toes between the time of his 1973 [5] surgery and 1993 surgery. Def. 56.1 ¶ 18–19; Pl. 56.1 ¶ 18–19.

## II Plaintiff's April 7, 1993 Surgery and Post Operative Recovery

In or about the third week of March, 1993, plaintiff notified his supervisor, Ernest Hupfer ("Hupfer"), that he was going to have surgery on his right foot and then later on his left foot. Def. 56.1 ¶ 22. On March 23, 1993, plaintiff notified Hupfer that his scheduled surgery was for Wednesday, April, 17, 1993, and that he would return to work as soon as possible (as long as he could stay off of his right leg), but that he may be out for as long as a week. Def. 56.1 ¶ 23; Matthews Decl., Ex. 2G (Plaintiff's EEO Investigative Affidavit, dated March 14, 1994, ("Pl. EEO Aff.")). Hupfer responded by reminding plaintiff to get documentation of the surgery and documentation that he could return to work. *Id.*

Thereafter, plaintiff filled out two Form 3971s,[6] and requested the following: (1) annual leave vacation from March 27, 1993, through April, 4, 1993, and (2) leave without pay on Monday, April 5, 1993. Def. 56.1 ¶ 24. Plaintiff did not return to work until Wednesday April, 7, 1993. Def. 56.1 ¶¶ 25–27; *see also* Matthews Decl., Ex. 3. Subsequently, plaintiff requested .4 hours

---

5. The exact year of plaintiff's previous toe surgery is not entirely clear to the Court since the parties' submissions invariably refer to the surgery as having been performed in 1972 and 1973.

6. Sick leave must be requested by filling out a Postal Service Form 3971, and approved in advance by the supervisor, unless the illness or injury is unexpected. Def. 56.1 ¶ 80; Veal Decl. ¶ 25 (citing Ex. D attached thereto) The pertinent Postal Service regulations provide:

> For periods of absence of 3 days or less, supervisors may accept the employees' statement explaining the absence. Medical documentation or other acceptable evidence of incapacity for work is required only when … the supervisor deems documentation desirable for the protection of the interests of the Postal Service.

Veal Decl. ¶ 25 (citing Ex. D attached thereto at § 513.361). The regulations additionally state:

> For absence in excess of 3 days, employees are required to submit medical documentation or other acceptable evidence of incapacity for work.

*Id.* (citing Ex. D attached thereto at § 513.362). The regulations further provide:

> The documentation should provide an explanation of the nature of the employee's illness or injury sufficient to indicate to management that the employee was (or will be) unable to perform his or her normal duties for the period of the absence. Normally, medical statements such as "under my care" or "received treatment" are not acceptable evidence of incapacitation to perform duties.

*Id.* (citing Ex. D attached thereto at § 513.364). In addition, the regulations state:

> If acceptable proof of incapacitation is not furnished, the absence may be charged to annual leave, LWOP, or AWOL.

*Id.* (citing Ex. D attached thereto at § 513.365).

If an employee has a major operation, or will be absent for 21 days or more, the employee must submit documentation to the Postal Service physician, and may have to submit to a duty status examination by a Postal Service doctor. Def. 56.1 ¶ 81; Veal Decl., ¶ 20.

of leave on April, 7, 1993, so that he could leave early for his 2:00 p.m. toe surgery. Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27.

On April 7, 1993, plaintiff's podiatrist performed surgery on two or three toes of plaintiff's right foot. Def. 56.1 ¶ 28; Pl. Dep. at 254–55. The surgery lasted a little over an hour, and consisted of inserting pins into plaintiff's toes, which extended approximately ¾ inches beyond the tips of the toes. Def. 56.1 ¶ 28; Pl. Dep. at 227. The tips of the pins were corked to prevent injury to plaintiff while walking. *Id.* Following the surgery, plaintiff was given an anti-inflammatory medication to be taken seven to fourteen days following the surgery. Def. 56.1, ¶ 29; Pl. Dep. at 219–20. Plaintiff determined he could perform his duties as a distribution clerk so long as he could elevate his foot. Def. 56.1 ¶ 30; Pl. Dep. at 233. On the day of the surgery, plaintiff's doctor advised him not to return to work until he was able to "work comfortably." Def. 56.1 ¶ 32; Pl. Dep. at 233. On April 8, 1993, at 3:50 a.m., plaintiff telephoned Hupfer and "notified him that [he] was in pain and that [his] right foot was swollen from the operation [he] had on the afternoon on 4–7–93 at 2:00 p.m." Def. 56.1 ¶ 33; Pl. Dep. at 297; Pl. EEO Aff. at 4. Plaintiff also notified Hupfer that his surgeon recommended he remain out of work for at least one week. Def. 56.1 ¶ 33; Pl. EEO Aff. at 4.

Plaintiff returned to work on April, 9, 1993. Def. 56.1 ¶ 34; Pl. EEO Aff. at 5–6. On that day, plaintiff provided Hupfer with a "Disability Certificate", dated April 7, 1993, issued by Comprehensive Foot Specialists, P.C., which read: "Surgery performed 4/7/93 . . . [Patient] unable to stand for long period of time, no more than ½ hour at a time." Def. 56.1 ¶ 36; Matthews Decl., Ex. 2I (Disability Certificate dated Apr. 7, 1993); Pl. Dep. at 325–26. While defendant claims the Disability Certificate made "no mention of plaintiff needing to elevate his foot," (Def. 56.1 ¶ 36), plaintiff claims there was a handwritten note attached to the Disability Certificate advising that Plaintiff was to elevate his foot. Pl. 56.1 ¶ 36; Pl. Dep. at 339. No such note has been provided to the Court.

During his first day back to work following his toe surgery, plaintiff informed Hupfer that he "was in pain, [his] foot was swollen larger and [he] had taken a second pain killer in 2½ hours time." Def. 56.1 ¶ 37; Pl. EEO Aff. at 5. According to plaintiff, "it was obvious to [himself] and employees next to [him] that [he] should not be at work." *Id.* Plaintiff asked Hupfer if he could "do nixie mail stamping or anything . . . with [his] leg elevated." Def. 56.1 ¶ 37; Pl. EEO Aff. at 6. Hupfer responded that "if [he] was unable to sit and throw mail, [he] should go home on sick time." *Id.*

On April 10, 1993, plaintiff telephoned Hupfer and informed him that he was "still in pain, but would be able to come to work if [he] could elevate [his] right leg at work." Def. 56.1 ¶ 38; Pl. EEO Aff. at 6. Hupfer advised plaintiff to stay home and to bring in additional documentation to support sedentary duties or the extent of the duties he could perform. *Id.* During their conversation, plaintiff claims Hupfer refused to discuss accommodations for plaintiff's foot. Pl. 56.1 ¶ 38; Pl. EEO Aff. at 7.

Plaintiff returned to work on April 12, 1993, and explained to Hupfer that his doctor informed him that "he had returned to work too early, and acted against [the doctor's] advice, which was causing the increased pain, throbbing, and swelling. The doctor was also concerned with the large amount of draining going on." Def. 56.1 ¶ 40; Pl. EEO Aff. at 8. After working about four hours, plaintiff's foot became swollen and he was in pain again, so he asked Hupfer if he could elevate his leg for

"20 minutes or so to relieve the pain and swelling." Def. 56.1 ¶ 41; Pl. EEO Aff. at 8. Hupfer denied plaintiff's request allegedly because of safety and operational concerns. Def. 56.1 ¶ 42; *see also* Matthews Decl., Ex. 5 (Hupfer EEO Investigative Affidavit dated May 2, 1994, ("Hupfer EEO Aff.")) at 3–5. According to plaintiff, upon denying Plaintiff's request to elevate his leg, Hupfer did not indicate that any operational or safety concerns compelled him to deny plaintiff's request. Pl. 56.1 ¶ 42; Pl. EEO Aff. at 9. Hupfer additionally informed plaintiff to go home "if he could not work and to use sick time." Def. 56.1 ¶ 43; Pl. EEO Aff. at 8. *See also* Matthews Decl., Ex. 4 (Deposition of Ernest Hupfer ("Hupfer Dep.")) at 28.

That afternoon, plaintiff went to his follow-up medical appointment and was told he "should not have returned to work so soon, and should remain home [un]til Wednesday, and only if [plaintiff] was up to it could [he] return earlier and, if so, on limited duty in a seated position only." Def. 56.1, ¶ 44; Pl. Dep. at 336.

Plaintiff did not work on Tuesday, April 13, 1993, because it was his day off. Def. 56.1, ¶ 45. Plaintiff did not work on Wednesday, April 14, 1993. Def. 56.1, ¶ 46; Pl. Dep. at 338. Plaintiff alleges his absence was due to an accident he had at home. Pl. 56.1, ¶ 46. Finally, on April 15, 1993, plaintiff returned to work and gave Hupfer another Disability Certificate, dated, April 12, 1993, issued by Comprehensive Foot Specialists, P.C. and signed by Richard Boccio, M.D., D.P.M., which read, "Mr. Amendola must be in a seated position at work until further notice. This is due to foot surgery." Def.'s 56.1, ¶ 47; Matthews Decl., Ex. 2I. Plaintiff alleges there was a handwritten note attached to the Disability Certificate stating Plaintiff must elevate his foot. Pl. 56.1, ¶ 47; Pl. Dep. at 339–40. However, no such note has been provided to the Court.

Thereafter, Hupfer requested that plaintiff provide additional medical information regarding "the nature of the illness or injury, a prognosis and diagnosis and date of return to duty," because the Disability Certificate, dated April 12, 1993, did not provide sufficient information regarding plaintiff's condition. Def. 56.1 ¶ 48; Hupfer EEO Aff. at 6–7; Hupfer Dep. at 62. By April 15, 1993, plaintiff's leg was no longer swollen and he informed Hupfer he could throw mail. Def. 56.1 ¶ 49. While defendant alleges plaintiff "sat in an office all day and was given a few work assignments," *id.*, plaintiff alleges he "was assigned to the 'VOMA' room and ordered to sit and not do any work," and that "[d]uring eight hours of April 15, 1993, no work was assigned Plaintiff despite Plaintiff's ability to work." Pl. 56.1 ¶ 49; Pl. EEO Aff. at 12.

Plaintiff returned to work the following day, April 16, 1993, and presented a third doctor's note to Hupfer. Def. 56.1, ¶ 51. The note, issued by Comprehensive Foot Specialists, P.C., and dated April 15, 1993, stated:

> Our patient Mr. Amendola had surgery done on 4/7/93. The surgery was a hammered toe 2nd digit right foot. Because of post operative pain & swelling patient must remain off foot for the post operative period. Patient is able to resume duties that do not require he be in a standing position.

Def. 56.1 ¶ 51; Matthews Decl., Ex. 2I. Plaintiff told Hupfer "[h]e could return to [his] duties as per the physician and specified in the doctor's note as long as [he] did not stand." Def. 56.1 ¶ 51; Pl. Dep. at 345. While defendant claims plaintiff said nothing about elevating his leg, plaintiff states "that at all times when speaking with Hupfer he requested a reasonable accommodation." Pl. 56.1 ¶ 51; Pl. Dep. at 345.

Later that same day, plaintiff learned that all but one of his requests for sick time had been rejected for insufficient documentation. Def. 56.1 ¶ 52; Pl. Dep. at 346. That afternoon, plaintiff obtained a fourth doctor's note from Comprehensive Foot Specialists, P.C. to clarify the previous three notes. Def. 56.1 ¶ 52; Pl. Dep. at 346. The next day, April 17, 1993, plaintiff returned to work and presented the fourth doctor's note to Hupfer. Def. 56.1 ¶ 53. The note read:

> This is to clarify the three notes previously given concerning Mr. Amendola, Mr. Amendola received foot surgery to his right foot on 4-7-03. Due to the surgery, Mr. Amendola was totally disabled and unable to work in the time period of 4/7/93—4/14/93. In the time period following 4/14/93, the patient is considered partially disabled but able to work at his normal duties, which does not involve standing. Mr. Amendola was and is still advised to elevate his right leg should swelling occur.

Matthews Decl., Ex. 2I (Letter from Dr. Boccio dated Apr. 16, 1997); see also Def. 56.1 ¶ 54.

Hupfer did not offer plaintiff overtime for his April days off because, in his opinion, "plaintiff could barely sit for his eight hour tour." Def. 56.1, ¶ 56; Hupfer EEO Aff. at 9–10. Plaintiff denies that he "could barely sit" for his eight hour shift and adds that he should have been offered overtime. Pl. 56.1 ¶ 56.

Plaintiff filled out six Form 3971's on May 6, 1993, requesting sick leave for .68 hours on April 7th, the entire shift on April 8th, 7.11 hours on April 9th, the entire shift on April 11th, 3.5 hours on April 12th, and the entire shift on April 14, 1993. Def. 56.1 ¶ 57; Pl. EEO Aff. at 12–17. Plaintiff was denied sick leave initially, but subsequently was credited for all the sick time at issue in this lawsuit following the conclusion of Postal Service griev-ance procedures. Def. 56.1 ¶ 82; Matthews Decl., Ex. 6 (grievance excerpts).

## III  Plaintiff's May 12, 1993 Surgery and Post Operative Recovery

On Wednesday April 28, 1993, plaintiff scheduled a second operation for the toes of his left foot for Wednesday May 12, 1993. Def. 56.1 ¶ 58; Pl. EEO Aff. at 17. According to plaintiff's doctor, the second surgery "should take two and a half hours and [plaintiff] would be laid up 4–5 days since the surgery would involve all the left foot toes, tendon lengthening, bone reshaping and pinning and possibly removing a growth." Def. 56.1 ¶ 59; Pl. Dep. at 389.

On May 12, 1993, about one week before the second surgery, plaintiff informed Hupfer of the surgery and requested "to switch [his] day off from Tuesday to Thursday of that week, to allow [his] day off to be the day after surgery...." Def. 56.1 ¶ 60; Pl. EEO Aff. at 19. Hupfer denied the request allegedly because Tuesday was "the lightest day of the week. [The Postal Service] was over budget, and ... didn't need extra people coming in." Def. 56.1 ¶ 60; Hupfer Dep. at 65–66; see also Pl. EEO Aff. at 19. Plaintiff additionally claims that Hupfer told plaintiff his surgery was unnecessary. Pl. 56.1 ¶ 60; Pl. EEO Aff. at 19–20.

Plaintiff filled out four Form 3971's on May 12, 1993, requesting three hours of sick leave for that day, and leave without pay for May 13th, 14th, and 15th. Def. 56.1 ¶ 61; Pl. EEO Aff., Attachment 8 thereto at 22–23. Plaintiff did not work Sunday, May 16, 1993, because it was his day off. Def. 56.1 ¶ 62; Pl. Dep. at 397. Plaintiff did not work Monday, May 17, 1993. Def. 56.1 ¶ 63; Pl. EEO Aff. at 20. Plaintiff did not work Tuesday, May 18, 1993, because it was his day off. Def. 56.1 ¶ 64; Pl. Dep. at 397.

Plaintiff returned to work on Wednesday May 19, 1993, wearing a closed toe surgical boot, with corked pins protruding from three toes of his left foot. Def. 56.1 ¶ 65; Pl. Dep. at 403–04; Hupfer Dep. at 75. After about two hours, plaintiff's leg became swollen and he was in intense pain such that he asked Acting Supervisor, Mr. Augustine, if he could take a short break. Pl. EEO Aff. at 21; Def. 56.1 ¶ 66; Pl. 56.1 ¶ 66. Mr. Augustine refused the request and informed plaintiff that he would have to use sick time. *Id.*

On May 20, 1993, plaintiff again returned to work and performed his duties for one and one half hours while sitting down with one foot elevated and the other one on the floor "for stability and support." Def. 56.1 ¶ 67; Pl. EEO Aff. at 22. Thereafter, Hupfer notified plaintiff that he could not elevate his foot while working, that he could not work on the work room floor while wearing a surgical boot, and that plaintiff should take sick leave until he could wear shoes to work. *Id.;* Hupfer Dep. at 75.

On May 21, 1993, while at home, plaintiff was contacted and informed by Postmaster William Balkin that he could return to work wearing a surgical boot and that he would be permitted to elevate his leg as long as one foot remained on the ground. Def. 56.1 ¶ 68; Pl. 56.1 ¶ 68.

## IV  Plaintiff's June 9, 1993 Surgery and Post Operative Recovery

Plaintiff's doctor, Dr. Richard Boccio of Comprehensive Foot Specialists, P.C., filled out a Disability Certificate on June 2, 1993, which read, *in toto:*

> Robert Amendola has been under my professional care and was partially incapacitated from 5/12/93 to 6/9/93. [Patient] should be on light duty with the [right] leg elevated.

Matthews Decl., Ex. 2O (Disability Certificate dated Jun. 2, 1993); *see also* Def. 56.1 ¶ 69; Pl. Dep. at 428. That same day, Dr. Boccio filled out another Disability Certificate stating:

> This is to inform you that Mr. Amendola will be having extensive surgery on his left foot on 6/9/93.

Matthews Decl., Ex. 2P (Disability Certificate dated June 2, 1993); *see also* Def. 56.1 ¶ 70; Pl. Dep. at 430–31. Dr. Boccio wrote another letter on June 9, 1993, which further stated:

> This is to inform you that Mr. Amendola underwent extensive foot surgery on June 9, 1993 and will be totally incapacitated and not able to work from 6/10–6/12/93.
>
> He may return to work on Monday, June 14, 1993 for duties in which he may be seated so that he may elevate his left leg as much as possible to reduce pain and swelling.

Matthews Decl., Ex. 2P (Letter from Dr. Boccio dated Jun. 9, 1993); *see also* Def. 56.1 ¶ 71; Pl. Dep. at 428.

Thereafter, on June 14, 1993, another doctor, Dr. Arthur L. Autz, also from Comprehensive Foot Specialists, P.C., filled out a Disability Certificate which read:

> Robert Amendola has been under my professional care and was: totally incapacitated from 6/14/93 to 6/16/93. Can return to work on Wednesday for sedentary duties.

Matthews Decl., Ex. 2P (Disability Certificate dated Jun. 14, 1993); *see also* Def. 56.1 ¶ 72; Pl. Dep. at 3. Dr. Autz subsequently prepared another Disability Certificate on June 28, 1993, which read:

> Robert Amendola has been under my professional care and was: partially incapacitated from 6/7/93 to present. [Patient] should be sitting leg elevated.

Matthews Decl., Ex 2P (Disability Certificate dated Jun. 28, 1993) (brackets added);

see also Def. 56.1 ¶ 73. Plaintiff does not recall whether he needed any further accommodations after June 28, 1993 for the foot surgeries he had between April and June 1993. Def. 56.1 ¶ 74; Pl. 56.1 ¶ 74.

## V Plaintiff's Grievance Proceedings

In June 1993, plaintiff filed grievances because he was not offered overtime on March 8, 1993, March 25, 1993 and "other days throughout April and May 1993." Def. 56.1, ¶ 82; Matthews Decl., Ex. 6 (grievance excerpts). In addition, plaintiff filed grievances for denial of sick leave on April 7th, 8th, 10th, 12th, and 14th of 1993. Id. These grievances were sustained and his sick leave was eventually credited. Id. Plaintiff also filed grievances because he was sent home and denied reasonable accommodations during April and May of 1993. Def. 56.1 ¶ 84; Matthews Decl., Ex. 6 (grievance excerpts). While defendant states "Plaintiff was eventually credited for all of the time at issue in this lawsuit", Def. 56.1 ¶ 85, plaintiff claims he "did not receive overtime equal to the amount of overtime [for which] he was bypassed." Pl. 56.1 ¶ 85.

## VI Plaintiff's Administrative Action

On May 6, 1993, plaintiff requested EEO counseling, naming Hupfer and Balkin as discriminating officials. Def. 56.1 ¶ 86; Matthews Decl., Ex. 2J (EEO Request for Counseling) at 1–2. Plaintiff claimed he was discriminated against because of his "handicap, & need for surgery, & light duty (at times)". Id. In his administrative complaint, dated June 22, 1993, plaintiff alleged discrimination based on his disability ("hip & toes") and did not indicate retaliation. Def. 56.1 ¶ 87; Pl. 56.1 ¶ 87; Matthews Decl., Ex 2N (Administrative Complaint dated Jun. 22, 1993) at 1. In his EEO claim, plaintiff alleged discrimination because (1) he was denied sick leave on April 7, 8, 9, 14, and 17, 1993; (2) he did not receive any accommodations at work

on April 9, 10, 12, and May 19–20, and 27, 1993; (4) he was bypassed for overtime March 8, 25, April 13 and 18, 1993; (5) his request for a schedule change was denied on April 7 and May 5, 1993; (6) his medical documentation was rejected on April 7, 10, 12, 14–16, and June 14, 1993; (7) he was subjected to verbal abuse on April 16, 17, 18, 29, May 17, and June 14, 1993. Def. 56.1 ¶ 88; Matthews Decl., Ex. 2L (EEO Investigation Report dated Sep. 7, 1994) at 1 and Ex. 2K (EEO Counselor Inquiry Report) at 2–3.

Plaintiff's EEO Counselor issued a Counselor's Inquiry Report identifying the basis of discrimination as "physical disability" from arthritis of hip and crushed toes, and retaliation based on the present action, rather than any prior EEO activity. Matthews Decl., Ex. 2K (EEO Counselor Inquiry Report) at 1. Plaintiff believes, but is not sure, that he may have filed an EEO complaint prior to June 22, 1993. Def. 56.1 ¶ 90; Pl. Dep. at 360, 363. Plaintiff has not provided any documentation of a prior EEO complaint, does not recall if he discussed a prior EEO complaint with Hupfer, and does not know if Hupfer had any knowledge regarding any of plaintiff's claimed EEO activities prior to March 1993. Def. 56.1 ¶ 90; Pl. Dep. at 380–83. Plaintiff believes the refusal of accommodations and verbal abuse were "based upon [his] handicap," rather than retaliation for any protected EEO activities. Def. 56.1 ¶ 91; Pl. 56.1 ¶ 91; Pl. Dep. at 369.

Plaintiff's EEO complaint was denied by an administrative judge who determined the discrimination and retaliation claims to be unsupported by the evidence. Def. 56.1, ¶ 92; Matthews Decl., Ex. 8 (Postal Service Administrative Decision dated Feb. 23, 1995). Although plaintiff did request reconsideration of that decision, he filed this action prior to receiving a deci-

sion on his motion for reconsideration. Def. 56.1 ¶ 92; Pl. 56.1 ¶ 92. As a result, on June 13, 1997, the EEOC dismissed plaintiff's request for reconsideration. *Id.*

## LEGAL STANDARD

A district court may properly grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of proof is on the moving party to show that there is no genuine issue of material fact, *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985)); *see also Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir.1996). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2725, at 93–95 (1983)).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Under the law of the Second Circuit, "when no rational jury could find in favor of the nonmoving party because the evidence is so slight, there is

no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224 (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)). Mere conclusory allegations, speculation or conjecture will not avail a party opposing summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996).

It is within this framework that the Court addresses the present summary judgment motion.

## DISCUSSION

### I Discrimination Under the Rehabilitation Act

Section 504 of the Rehabilitation Act provides "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a) (Supp. V 1993). The standards used to determine a violation of Section 504 "shall be the standards applied under title I of the Americans with Disabilities Act of 1990 ... and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990...." 29 U.S.C. § 794(d). In order to withstand a motion for summary judgment on a claim of discrimination under the Rehabilitation Act, plaintiff bears the initial burden of establishing a prima facie case. *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir.1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). To do so, Plaintiff must demonstrate: (1) that he is an individual with a disability within the meaning of the Act; (2) that he was otherwise qualified to perform his job; (3) that he suffered an adverse employment

action because of his disability; and (4) that the defendant employer receives federal financial assistance. *See Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir.1999); *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program Inc.,* 198 F.3d 68, 72 (2d Cir.1999); *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998); *Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 383 (2d Cir.1996); *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 135 (2d Cir.1995); *Heilweil,* 32 F.3d at 722. "Failure to establish one of the four elements is fatal to a claim of employment discrimination." *Reidy v. Runyon,* 971 F.Supp. 760, 768 (E.D.N.Y. 1997) (citing *Sedor v. Frank,* 42 F.3d 741, 746 (2d Cir.1994), *cert. denied,* 515 U.S. 1123, 115 S.Ct. 2279, 132 L.Ed.2d 283 (1995)). Since the Court determines that plaintiff cannot establish the first element of his prima facie case, namely, that he is an individual with a disability within the meaning of the Rehabilitation Act, the Court will limit its inquiry to that issue.

## A. Plaintiff is Not an Individual with a Disability under the Rehabilitation Act.

█ The term "individual with a disability" is defined by the Act as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B); *see also Heilweil,* 32 F.3d at 722 (quoting former § 706(8)(B)). In *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court observed that the Americans With Disabilities Act's ("ADA") definition of disability is drawn almost verbatim from the statutory language of the Rehabilitation Act, *see id.* at 631, 118 S.Ct. at 2202, as such "the terms common to both regulatory schemes are to

be interpreted in the same way." *Sacay v. The Research Found. of CUNY,* 44 F.Supp.2d 496, 502 (E.D.N.Y.1999) (citing *Stone v. City of Mount Vernon,* 118 F.3d 92, 96 (2d Cir.1997)). In the Second Amended Verified Complaint, plaintiff alleges that he is a qualified individual with a disability and/or perceived as an individual with a disability. Am. Compl. ¶¶ 6, 7, 15. Thus, it appears that plaintiff is claiming that he satisfies either the first and/or third definition of "disability" under the Act.

### 1. *Impairment That Substantially Limits Major Life Activities.*

In *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court articulated a three step analysis for evaluating a claim of disability under the first definition of "individual with a disability". *Id.* at 631, 118 S.Ct. at 2202; *see also Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 641–45 (1998) (applying *Bragdon's* three-step analysis). The first consideration under that analysis is whether or not a plaintiff has suffered a physical impairment. *Bragdon,* 524 U.S. at 631, 118 S.Ct. at 2202. Next, the Court must identify the major life activity which might have been limited by the impairment. *Id.* Finally, the Court considers whether the impairment "substantially limited" that major life activity. *Id.* As previously noted, courts apply *Bragdon's* analysis with equal force to claims arising under the Rehabilitation Act. *See, e.g., Sacay,* 44 F.Supp.2d at 500, 502; *Zuppardo v. Suffolk County Vanderbilt Museum,* 19 F.Supp.2d 52, 54–55, 56 (E.D.N.Y.1998).

Turning to the first step in the analysis, the regulation implementing the Rehabilitation Act interprets a "physical or mental impairment" as including " 'any physiological disorder or condition ... affecting ... the [musculoskeletal] body system[ ].' "

*Bragdon,* 524 U.S. at 631, 118 S.Ct. at 2202 (quoting 45 C.F.R. § 84.3(j)(2)(i) (1997)). In the Second Amended Verified Complaint, plaintiff appears to allege a physical impairment in connection with his toes and related foot surgery. Am. Compl. ¶¶ 17, 18. Indeed, the basis of this lawsuit stems from plaintiff's request for, and the subsequent denial of, a "reasonable accommodation ... for the period commencing on April 9, 1993 through his recovery from [toe] surgery ... to be able to elevate his right foot while performing his job duties." Am. Compl. ¶ 17. It is undisputed that plaintiff underwent multiple corrective surgeries on his toes between April and June of 1993. The evidence suggests that plaintiff suffered from a condition caused by several hammered toes. Matthews Decl., Ex. 2I. Drawing all reasonable inferences in favor of plaintiff, the Court assumes, without deciding, that plaintiff has established the requisite physical impairment.

Next, the Court must identify the major life activity affected by the impairment. The pertinent regulations further interpret the term "major life activities" to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing learning, and working." *Bragdon,* 524 U.S. at 638, 118 S.Ct. at 2205 (1998) (quoting 45 C.F.R. § 84.3(j)(2)(ii)(1997) and 28 C.F.R. § 41.31(b)(2) (1997)); *see also* EEOC Regulations, 29 C.F.R. 1630.2(i). Although the Second Amended Verified Complaint does not clearly identify the major life activity affected by plaintiff's impairment, a reason in and of itself supporting dismissal,[7] the Court nevertheless finds the allegations and evidence of plaintiff's foot surgery, combined with his documented requests for workplace accommodations, sufficient to identify the major life activities of walking and working.

■   Finally, the third step in the *Bragdon* analysis requires the Court to determine whether plaintiff's physical impairment substantially limited the asserted major life activities of walking and working. *See Bragdon,* 524 U.S. at 638, 118 S.Ct. at 2205. Although the Rehabilitation Act regulations provide no guidance on this issue, the EEOC regulations implementing the ADA define the term "substantially limits" to mean: "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii)[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Colwell,* 158 F.3d at 643 (quoting EEOC Regulations, 29 C.F.R. 1630.2(j)(1)). To that end, the regulations recommend considering the following three factors when determining whether an individual is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Colwell,* 158 F.3d at 643 (quoting EEOC Regulations, 29 C.F.R. § 1630(j)(2)). *See also Ryan,* 135 F.3d at 871–72; *Murray v. Bokman,* 2001 WL 603698, *5 (W.D.N.Y. May 24, 2001).

It is well-settled, however, that "temporary, nonchronic impairments of short duration, with little or no long term or permanent impact, are usually not dis-

---

**7.** *See Sacay,* 44 F.Supp.2d at 500–02 (failure to specify the claimed disability and/or substantially impaired major life activity in complaint alleging ADA/Rehabilitation Act violations supports dismissal under Fed.R.Civ.P. 8).

abilities." *Murray*, 2001 WL 603698, *5 (quoting 29 C.F.R. Pt. 1630.2(j) App.). Courts considering the duration of an impairment have consistently held that short-term impairments in the ability to work, including post-operative recoveries, do not constitute a disability because they are of too short a duration to be considered substantially limiting. *See, e.g., Adams v. Citizens Advice Bureau*, 187 F.3d 315, 316–17 (2d Cir.1999) (three and one-half month inability to work while recovering from surgery not covered by ADA); *Colwell*, 158 F.3d at 646 (seven-month recuperation following hospitalization is of too short a duration to be substantially limiting); *Sanders v. Arneson Prod.*, 91 F.3d 1351, 1354 (9th Cir.1996) (three and one-half month impairment with minimal residual effects not substantially limiting), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 200 (4th Cir. 1997) (two month impairment not substantially limiting); *McDonald v. Commonwealth of Pennsylvania, Dept. of Public Welfare*, 62 F.3d 92, 96 (3d Cir. 1995) (two month inability to work while recovering from surgery not covered by ADA); *Murray*, 2001 WL 603698, *5 (diverticulitis and temporary colostomy do not substantially limit major life activity of working); *Fagan v. United Int'l Ins. Co.*, 128 F.Supp.2d 182 (S.D.N.Y.2001) (temporary inability to do work following knee surgeries does not have required duration or long-term impact to qualify as a disability under ADA).

In the present case, the "duration" of plaintiff's physical impairment is problematic. Indeed, the undisputed medical evidence submitted by the defendant reveals that plaintiff had no more than a temporary impairment between April and June of 1993. In particular, documents from plaintiff's treating physicians to the defendant during that period indicate that plaintiff was required to remain off his foot for the "post operative period [ ]" following the April 7, 1993 surgery *"[b]ecause of post operative* pain [and] swelling...." Matthews Decl., Ex. 2I (emphasis added). Following the May 12, 1993 surgery, a disability certificate, dated June 2, 1993 from plaintiff's treating physician, Dr. Boccio, states that plaintiff was "[p]artially incapacitated" between May 12, 1993 and June 9, 1993, and should be on light duty with his leg elevated. Matthews Decl., Ex. 2O. Lastly, following plaintiff's third and final surgery on June 9, 1993, a letter from Dr. Boccio states that plaintiff was "totally incapacitated and not able to work" from June 10 to June 12 of 1993 and that following his return to work on June 14, 1993, plaintiff should be assigned duties which permit him to work while seated so that he could elevate his leg "to reduce pain and swelling." Matthews Decl., Ex. 2P. Even accepting plaintiff's version of the facts as true, he cannot demonstrate that he had anything more than a temporary physical impairment following each of his foot surgeries between April and June of 1993. Although plaintiff is "not sure" whether he required any accommodations after June 28, 1993, Pl. Dep. at 434, he has produced no evidence that he had anything more than a temporary impairment. Accordingly, plaintiff fails to demonstrate that he has an impairment which substantially limits the major life activities of walking and working. *See Colwell*, (seven month post-hospitalization recovery together with vague restrictions on work insufficient to demonstrate substantial limitation on major life activity); *Murray*, 2001 WL 603698, *5 (temporary medical impairment does not substantially limit major life activity of working); *Fagan*, 128 F.Supp.2d at 185–86 (postoperative recovery following multiple knee surgeries fails to establish requisite long-term impact to qualify as a substantially limiting disability).

### 2. *Regarded as Having an Impairment*

Finally, to the extent plaintiff's allegations could be read to claim a disability within the third meaning of the Act, namely, that the plaintiff was "regarded" as having an impairment that substantially limits a major life activity, *see* Am. Compl. ¶¶ 7, 15, such claim also must fail. As the Second Circuit explains, "whether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'" *Colwell*, 158 F.3d at 646 (quoting *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir.1997)). To that end, it is insufficient to demonstrate that the employer regarded the plaintiff as somehow disabled. *Id.* "The plaintiff must show that the employer regarded the individual as disabled *within the meaning of the [Rehabilitation Act]*." *Id.* (citing *Francis*, 129 F.3d at 285–86) (emphasis original). As such, the plaintiff must adduce evidence that his employer perceived him as having an impairment that substantially limited a major life activity. *Id.* Plaintiff herein has come forward with no such evidence on this motion. To the contrary, all evidence points to the conclusion that the defendant perceived plaintiff as merely requiring post-operative recovery time following his foot surgeries between April and June of 1993. As a result, the evidence is insufficient to permit the inference that the defendant perceived plaintiff as having an impairment that substantially limited him in one or more major life activities. *Cf. id.*, 158 F.3d at 647 (assignment to light duty insufficient to support inference that employer viewed plaintiff as disabled). To do so, plaintiff must prove that the defendant "'perceived [him] to be incapable of working a broad range of jobs' suitable for persons of [his] age, experience, and training." *Id.* at 647 (quoting *Ryan*, 135 F.3d at 872). No such showing has been made on this motion.

Accordingly, summary judgment is appropriate on plaintiff's Rehabilitation Act claim.[8]

## II  Retaliation Claim

Section 794a of the Rehabilitation Act expressly adopts the anti-retaliation provisions of Title VII. 29 U.S.C. § 794a. Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." *Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2d Cir.2001) (quoting 42 U.S.C. § 2000e–3(a)) (brackets original). To survive a motion for summary judgment, the plaintiff must establish a prima facie case of discriminatory retaliation. *Id.* To that end, "plaintiff

---

8. Although no argument has been made, to the extent plaintiff may claim that he was "disabled" based on his 1987 hip injury and assignment to light duty by the defendant between 1987 and 1991, it is undisputed that plaintiff remained on "Fit For Duty" status from July 8, 1991 to May 1995. Def. 56.1 ¶¶ 16, 17; Pl. 56.1 ¶¶ 16, 17. As in *Colwell*, assignment to prolonged light duty does not equate to being perceived as disabled within the meaning of the Act. *Colwell*, 158 F.3d at 647. Plaintiff was required to demonstrate that the defendant "perceived [him] to be incapable of working in a broad range of jobs suitable for persons of [his] age, experience, and training." *Id.* (internal quotation omitted). No such showing has been made. In any event, the basis of this lawsuit stems from plaintiff's 1993 request for, and denial of, an accommodation during his April through June recovery from multiple foot surgeries. Am. Compl. ¶ 17. Plaintiff has submitted no evidence from which a reasonable juror could infer that the 1993 denial of his request for an accommodation was related to his hip injury and assignment to light duty between 1987 and 1991.

must show that [he] 'engaged in protected participation or opposition under title VII, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action.'" *Id.* (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 208–09 (2d Cir.1990)). *See also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998); *Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998); *Sands v. Runyon*, 129 F.3d 114 (2d Cir. 1997) (citation omitted); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1307 (2d Cir.1995); *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 64 (2d Cir.1992) (quoting *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991)).

However, prior to commencing suit under the Rehabilitation Act, a plaintiff is required to exhaust the administrative remedies at his disposal. *See Downey v. Runyon*, 160 F.3d 139, 145 (2d Cir.1998) (citing *Brown v. General Servs. Admin.*, 425 U.S. 820, 828–29, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Stewart v. INS*, 762 F.2d 193, 197–98 (2d Cir.1985); *McGuinness v. United States Postal* Serv., 744 F.2d 1318, 1319–20 (7th Cir.1984); *Guice–Mills v. Brown*, 882 F.Supp. 1427, 1429–30 (S.D.N.Y.1995)). "A district court only has jurisdiction to hear [Rehabilitation Act] claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. New York Dept. of Housing, Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993) (citations omitted).

In the Second Amended Verified Complaint, plaintiff alleges that defendant's denial of his requests for an accommodation, sick-time, and/or overtime between March and June of 1993, "occurred in whole or in part as retaliation for Plaintiff's pursuance of a previous complaint of discrimination." Am. Compl. ¶ 34. Plaintiff timely filed an EEO complaint on June 22, 1993. Matthews Decl., Ex. 2N. Although plaintiff fails to mark "retaliation" as a basis of discrimination in the EEO complaint, plaintiff does allege "retaliation" as a basis of discrimination in his summary of discriminatory actions attached to his EEO complaint. Specifically, plaintiff alleges "[r]etaliation for filing EEO complaint in open admission the day before [June 19, 1993]." *Id.* Significantly, nowhere in the EEO complaint does plaintiff identify any discriminatory actions underlying his charge of retaliation following the filing of his EEO complaint on June 19, 1993. *See id.* However, in the Second Amended Verified Complaint, plaintiff appears to claim that the acts underlying his claim for discrimination, namely, the denial of an accommodation, sick time, and/or overtime, between April and June of 1993 support his claim of retaliation. Yet, on this motion, plaintiff has produced absolutely no evidence concerning the filing of a prior EEO complaint. Despite the obvious procedural flaws in plaintiff's EEO filing, the Court alternatively dismisses plaintiff's retaliation claim for failure to state a prima facie case of retaliation.

Although it is undisputed that the filing of an EEO complaint is a protected activity, plaintiff has failed to establish the requisite causal connection between plaintiff's participation in that protected activity and the adverse employment decisions, here, the denial of an accommodation, sick time and/or overtime. The alleged discriminatory acts underlying plaintiff's EEO complaint are the same acts upon which he attempts to bootstrap his retaliation claim. Under such circumstances, plaintiff cannot establish the requisite causal connection because the denial of an accommodation, sick time and/or overtime was the basis of

plaintiff's EEO complaint. *See Tone v. United States Postal Serv.*, 68 F.Supp.2d 147, 152–53 (N.D.N.Y.1999), *aff'd*, 242 F.3d 368 (2d Cir.2000). Indeed, a "[d]efendant's retaliatory action cannot take place before plaintiff engaged in a protected activity...." *Id.* Accordingly, in the absence of any evidence demonstrating plaintiff's participation in a prior protected activity of which the defendant was aware, plaintiff's retaliation claim must be dismissed.

## CONCLUSION

Accordingly, for all the aforementioned reasons, defendant's motion for summary judgment is GRANTED in its entirety.

The Clerk of the Court is directed to mark this case as closed.

SO ORDERED.